Colleague Judge Friedman has a motion and the court will now entertain that motion. Thank you. It is my pleasure to move the admission of my law clerk, Neil C. Hannon, who is a member of the Bar of the State of New York, and I can assure everyone that he is well qualified for membership in the Bar of this court. The court is inclined to grant your motion and you are admitted. Welcome to the court. If you will address the courtroom deputy, you can take the oath. Mr. Hannon, we solemnly swear upon that you will report yourself to the attorney and counsel of this court uprightly in accordance with the law, and that you will report to the Constitution in accordance with the law. Thank you. Congratulations. Welcome. All right. The first case we will hear is field number 2008-15-11, Therasense v. Becton. Mr. Singlup. Good morning, Your Honors. May it please the court, Robert Singlup of Munger, Tolles, and Olson, for the plaintiff, Helen Avinlack, please. Your Honors, I'd like to begin by discussing the claim construction issue related to the 164 patent, the non-flowing manner term, for a couple of minutes to make sure it doesn't get lost, and then turn to the 551 patent, the issues of inexplicable conduct and obviousness, which take up much of the briefing. With respect to the non-flowing manner limitation, the 164 patent and the 745 patent both include limitations requiring Even if the district court's construction of non-flowing manner was too broad, we have here something in the Hughes device that is more than convective flow, right? There's a swirling motion in it. Your Honor, the district court, the defendants No, no, but try to answer my question. What the district court said is there's a swirling motion, and that the defendant's experts claim that they saw this. The district court found on summary judgment that there was no disputed issue of fact because our expert, Abbott's expert, Dr. Barr, admitted that that is convective flow. So the only reason summary judgment was granted is because Abbott's expert admitted that that swirling motion was convective flow, and the district court concluded that because it was Was there any dispute about whether it was a swirling motion? There was no dispute that there was motion, swirling or otherwise, but the dispute was whether that motion constitutes convective flow, the motion you'd find in any liquid, a glass of water on a table But the swirling motion isn't the motion that you would find in any liquid, right? I don't believe, Your Honor, that that was an undisputed issue. I think that our expert testified that what he saw was what he would consider convective motion. Did he say there was no swirling motion? He did not say there was no swirling motion, Your Honor. He admitted there was some swirling motion that he saw. But he also testified that he did Cottrell measurements, and this is in the district court's discussion of the issue, that our expert said he did Cottrell measurements, and that those measurements would only prove accurate if there was nothing other than convective flow. And because those measurements, by his calculations, came out accurately, the only thing he could see there must be simply convective flow. Is there any dispute as to whether it's called swirling or convective, that there was a flow? Your Honor, convective... No, just answer my question. Was there any dispute that there was a flow, whether you characterize it as swirling or convective? Our expert admitted that he considered that to be convective flow. So there is no dispute that there was flow? I think that's correct, Your Honor. So it's important for you then to persuade us that the claim construction was wrong, and that non-flowing should mean non-flowing through, not within. Yes, Your Honor. I agree with that. So let me try to do that. There are two reasons that the claim construction of non-flowing to mean not moving or no flow, even convective flow, is incorrect. First, as a matter of ordinary English, the word flow, and the specification itself analogizes to a stream. Flow refers to movement as a stream. And the specification itself talks about the blood sample moving as a stream and stopping the stream. When one stops a stream, one does not stop all movement, convective flow otherwise, within the sample. What one stops is the flowing through the channel, the flowing down the river. Secondly, in the prosecution history itself, the meaning and the implication of the non-flowing manner limitation is very clear and explicit. Non-flowing manner was added to the claim specifically to address the examiner's objections relating to the Niwa and Takata pacts. And there's no dispute about this. There can be no dispute. The prosecution history, I point the court to Joint Appendix page 13,791. Suppose we reject the damming construction and say that that's not correct. Do you then lose? If the court rejects the construction of not flowing through, we still would contend that the construction must mean something more than convective flow. It must mean more than the convection you find in all liquids. Some other kind of movement. Why? Because if the limitation was limited to prohibit convective flow, then there would be almost no device, no fluid that would meet the claim limitations. All fluids have convective flow. That's undisputed in the record. Our expert testified that when he used the term convective flow, he was referring to the kind of movement, the kind of fluid dynamics you find in all liquids. Even a cup of water sitting on a table. That's not disputed in the record. So if this term is interpreted in this way, it would be inoperative. There's no rational reason to think that when Abbott added the term non-flowing manner, it meant to exclude all liquids. Okay, so what's the alternative construction? Suppose we reject the flow through construction. What's an alternative construction which benefits you? An alternative construction that benefits us would be the construction that's supported, obviously, by the record we think is not flowing through. And if the court gives me a moment, I'll come back to this and propose a construction that would still benefit us. That would be short of not flowing through. Mr. Singler, I noticed in the record there was an interview in this case. And there was an interview summary. This is appendix page 13791. Yes, Your Honor. And the examiner said that applicants will consider introducing a limitation regarding non-flow through measuring. Yes, Your Honor. But yet the amendment was in a non-flowing manner. What are we to make of that? I don't think the court should make anything. Obviously, if the claim had been amended to say in a non-flow through manner, we wouldn't be arguing about this. I agree, Your Honor. But if the court looks at the notice of allowance, which is just a few pages later, the examiner expressly says that by adding the non-flowing manner limitation, he understood Abbott to be excluding the flow through embodiments, which are the only things that were the basis of his objection. There's nothing in the specification or in the record that supports the construction of non-flowing to mean no movement whatsoever. Do you say it is limited to things that flow through the chamber? Yes, Your Honor. So no matter how turbulent it was, it would still be non-flowing if all the turbulence was confined to the chamber. Yes, Your Honor. And to answer Judge Dyke's question, I think an alternative construction that would make sense and benefit Abbott and require reversal would mean no movement other than the kind of convective flow that you find in all liquids. Something more than convective flow. Does the fact that you're spending so much time on this issue suggest a lack of confidence as to your arguments as to the 551? No, Your Honor. In fact, I was watching the clock here, and I would like to turn, if I could, to the 551 issue. It's quite the contrary. In fact, I was hoping to just spend a couple minutes on the 164 to make sure we didn't lose sight of that. In light of the time, why don't you begin with the unenforceability issue? Yes, Your Honor. On the issue of inactive conduct, the district court, as the court knows, found inactive conduct based solely on the failure to submit these two legal briefs that were submitted to the EPO. It's not just failure to submit the briefs. It's because they failed to point out, as I understand it, that inconsistent statements or statements that people might view as inconsistent had been made before the European Patent Office. Isn't that basically what it is? Yes, Your Honor. The failure to explain or disclose to the examiner that certain statements have been made in the EPO about a prior art patent, the 382 patent. And they seem, on the face of it at least, to be inconsistent, don't they? No, Your Honor. We don't believe they do. And I'd like to address that. But before I address that, I would like to make one other point, which is that even if the court concludes that they are inconsistent, or the district court was right on that, this court's precedent is very clear in case after case that characterizations of prior art cannot be the basis of an equitable conduct. This court has held that in the InnoGenetics case. Yeah, but those cases seem to be pretty distinguishable. Try to tell us why they're not inconsistent, because I think you've got a real problem there. Okay, Your Honor. With respect to the first submission, I guess you have a decent argument that those statements can be read to suggest that there's no semi-permeable membrane the way there was in the D1 reference. But I have a great deal of difficulty in reading the second submission as limited to that. It seems to be clear that it's making two alternative arguments. One, that we don't require a membrane at all, and second, that even if there is a membrane, it's not the sort of semi-permeable membrane that you found in D1. I mean, particularly to address page 65E5. Yes, Your Honor. If we look at that page, what the district court relied on, and the only language the district court relied on in all this briefing, is the quotation of the optionally but preferably sentence the following two sentences. It is submitted that this disclosure is unequivocally clear, and then the paraphrase below that of the optionally but preferably sentence. And the question is— And then the next sentence says, furthermore, which sounds as though it's making a different point about the semi-permeable membrane. Yes, that is what the district court found, that that's what the word furthermore meant. But I would point the court to the sentence before the quotation, which the court will notice is not in the district court's opinion, and is not addressed by the defendants in their briefs. The sentence before the quotation. Why is that language being quoted? It says, a membrane did not appear but in original claim 13, and is defined as a protective membrane permeable to water and glucose molecules. And then it cites column 5, line 30 to 34, and this language. Why is the language being quoted, Your Honor? The language is clearly being quoted because that is the place in which the membrane is defined as permeable. I mean, the sentence before sets up and explains why the lawyers were quoting this language. But you said you're trying to argue, it seems to me, that the sentence doesn't really mean what it seems to say. And my question to you is, is that something for the patentee to decide or for the examiner? If they had disclosed it and explained why they think it's different, maybe the examiner would have agreed. Maybe not. Maybe the examiner would have said, well, never mind that. It seems to me this is a critical issue in the case. And you seem to me to have taken the exact opposite interpretation of the meaning when you were in Europe than you're taking here. Your Honor, the sentence was clearly before the examiner. Pardon? The sentence was clearly before the examiner, optionally but preferably. The only thing that was not before the examiner are the phrases before and after this. Those are interpreting the statement in the 382. Before the examiner in the United States, you said to him these statements really shouldn't be interpreted to disclose a membrane-less embodiment. And in the EPO, you're directing yourself to the same sentence. You say the opposite. That's the problem you've got. Your Honor, let me point out that even if this court concludes that the language means the opposite, that what's argued here is inconsistent, even if this court concludes that, there's still the question of intent. The only evidence of intent here, and I would point out that, again, this is characterizations of prior art, which I think this court has held cannot be the basis of an act of conduct. At most, it's, I would say, of low materiality. Well, you say it's low materiality. This very phrase, optionally but preferably when being used on live flood, was placed by counsel right in the middle of the argument. The whole dispute over patentability was focused on that language. I agree with that, Your Honor. So if we have a statement on that very same language that's arguably inconsistent, it's hard to argue that's not material, and it's hard to argue it's not highly material. Even if it were material, even if it were highly material, the question is whether Mr. Pope had a reasonable explanation. If he had a credible, plausible explanation for his reading… Perhaps so, but the district court here held a bench trial. It looked him in the eye. It allowed him to testify, and he didn't believe him. But the only base the district court gave, Your Honor, for not believing him is that the district court disagreed with this reading. And I would point out the EPO board itself… No, I don't think that's not a correct statement. He found his testimony not credible based on his conduct on the stand. So the only thing the district court said is he's based on his demeanor. I find him not to be credible. And also because I don't believe his explanation of this language. I don't read it the same way. Isn't that within the discretion of the district court? No, Your Honor. We don't believe so. The district court cannot immunize its decisions by citing the words credibility or demeanor. Can't the district court look at a witness and say, I don't find him credible the way he's testifying? I mean, we don't know what it is, but for all we know, every time he was asked a question, looking at the cold record, if it was a difficult question, you saw he turned to his lawyer and looked at him, and the lawyer even blinked one or two eyes. We don't know. But the district court, Your Honor, doesn't give any basis for its credibility finding. It doesn't say he looked at his lawyer. It doesn't say he hesitated when answering. The district court doesn't say there was an inconsistency in his testimony. Does the court have to? Your Honor, when you cite cases, that's it. Does a tribunal making a credibility determination, a fact credibility determination, have to explain in detail what led the court to make that determination for it to be entitled to significant weight in the appellate court? I don't think so. Your Honor, otherwise, if a district court could simply say, I found the witness not to be credible, there would be no way for this court to review its decision. If the district court says, I found his explanation not to be credible. You say there's no way for this court to review that decision at all. That seems to me to suggest that maybe we have very little discretion in dealing with these credibility determinations. Unless he says something, he says, I don't believe this is a credible witness because of the way he tied his necktie, something like that. But apart from that kind of thing, once the court says, I've seen the witness and I don't find the witnesses credible, it's very difficult for an appellate court to review that because there's nothing much to review. You can't tell on the cold record whether the judge was right or wrong. And so, therefore, we tend to defer to credibility determination. I understand. Can I make two points just on the question? Very briefly, because we're already out of time. And I'm going to restore your rebuttal, but just make your point very briefly. Very briefly, two points. Very quickly, on the question of whether there's an inconsistency in this language, which Judge Dyke suggested that you believe there's an inconsistency. We'd point out two things. One, the EPO board itself read this language and explains how it reads this language. And in its explanation of this argument, it doesn't cite the idea that there's the membranes option. It only talks about the permeability. It doesn't reject. It doesn't say we don't read this language as making the membrane optional. No, Your Honor, but you wouldn't expect. They just don't refer to it. Right. And you wouldn't expect them to say they reject it if they didn't read that there. The second thing is there were all these scientists who testified and all these experts pertaining by the other side. Not one expert got up, not one scientist got up and said that there's an inconsistency here, that this language is different than what was argued, and that a person of ordinary skill reading this would read this as different than what was told to the PTO. Are you arguing that there's a distinction here between the arguments made in Europe and the arguments made here in this case based on the fact that in Europe the claim was broad enough to cover both the whole blood and interstitial fluid, and in those situations the argument was made that no membrane was necessary for either case? But here the claim is limited to whole blood. Correct, Your Honor. In the 551 patent the claim is limited to whole blood. In the 636 or 382 patent the claims are much broader. In fact, they explicitly call it interstitial fluid where everyone agrees a membrane is optional. So is it your position that that's why the statements were made somewhat differently in Europe? Because in that case there were options available because it was not only whole blood, but whole blood and interstitial fluid, which presents a different circumstance regarding a membrane. Yes, Your Honor, exactly. But that explanation to which you just alluded was never made before the examiner, was it? The examiner was never told the seemingly inconsistent statements, but they're not really inconsistent because? That's correct, Your Honor. But Mr. Pope testified without impeachment, without contradiction, without any internal inconsistency, that when he read this, because of what Judge Lin just pointed to, that's one reason he read this as having nothing to do with whether a membrane was optional for blood. That was an explanation he provided for his understanding of these documents. All right, let's hear from the other side. We'll restore your three minutes. Thank you, Your Honor. All right, I understand that you're going to split the argument, is that correct? We are, Your Honor. Always a risky thing to do, but that's your choice. But I'm going to leave it to you to watch the clock. I'm not going to police the timing, so if you shortchange your colleague, that's your problem. I will try not to do so. We had no choice in this event, Your Honor, because the 164 patent was not asserted against Bayer Healthcare, my client. I understand. Are you dividing the argument by issues? We are, of necessity, I'm not addressing the 164. But you're both going to address the 551? Otherwise, we have simply split the time, Your Honor. But we have agreed that I will address certain points, and Mr. Bagley will try to follow up. First, Mr. Singleton did not address the 745 patent, and so unless the panel has questions, I will not address that either. Okay, I'd like to start actually with, although Mr. Singleton did not address invalidity, with one point that was raised in the reply brief of Abbott on invalidity, that we have not previously had a chance to respond to, that I just want to respond to. And that is a point that was made in the reply brief that says, with respect to differences between the 382 disclosure and the 551 disclosure, that oxygen sensitivity was a key issue. This was not actually something that was argued at trial, but now Abbott is arguing oxygen sensitivity was a key issue, and the oxygen sensitivity tests on which they relied in its post-trial submissions and which the court relied on in finding that the 382 and the 551 had similar results were not, in fact, similar. So 382 says oxygen sensitivity tests were done on the membrane-less sensor in buffer and showed an oxygen sensitivity of 5%, which is acceptable. The 551 discloses oxygen sensitivity of 4% with respect to the electrodes discussed therein. And in the reply brief, Abbott argued that the tests in the 382 were meaningless because they were performed in buffer, and the 4% in the 551 was different because it was for anaerobic and foliarobic samples. But if the court, in fact, looks at the 382, it will see that the tests in the 382 that were performed in buffer were performed on exactly the same kinds of samples, anaerobic and foliarobic. This is all in Example 8 in Column 9 of the 382 at JA6511, where it says in separate tests there was first a nitrogen-saturated buffer solution tested and then an air-saturated buffer solution tested. That is, in fact, anaerobic. That's nitrogen. And oxygen-saturated, that's the oxygen-saturated solution. You both seem to have a fondness for sort of peripheral issues. Is there some reason for that? Your Honor, the only reason I mention this is because this was a statement that was a characterization of the 382 in the reply brief, to which we hadn't had a chance to respond, and it is just wrong. Let me turn to inequitable conduct. First of all, to start with a question that, Judge Friedman, you were discussing with Mr. Singler at the end of the argument, there is absolutely no case law authority that says that when a district court makes credibility determinations, it must go into chapter and verse about gestures or facial expressions or the underlying bases for those determinations. Second, of course, this is not a case in which the opinion of the district court simply said, I didn't find the witness credible, and so I'm finding intent. There was quite a lengthy discussion by the district court of all of the evidence, of all of the record, and a very compelling case here, that this is the unusual case in which inequitable conduct actually should be found. It's not a case of inadvertence in any way. These two gentlemen, Mr. Pope and Dr. Sanghera, clearly knew all the facts. They made a deliberate decision not to submit, and then when they got to trial, and Mr. Pope affirmatively came forward and said he wanted to testify, even though his testimony was originally excluded, because of preclusion of questions at deposition, he put forward shifting and each time not credible explanations for his conduct, not credible because they simply could not be squared with the language. Is there any evidence showing that before they went ahead in the United States, they discussed and made a conscious decision not to submit to the American patent office what they had submitted and said in the European patent office? In other words, did they get together and say, now when we're prosecuting the American patent, we better not say this, or we better not point that out. Is there any evidence that they had such a discussion, or is that all implied? Your Honor, that is exactly the evidence. The evidence is that Dr. Sanghera, who was directly, personally involved in Europe, came to assist Mr. Pope with his prosecution, that he told him what had happened in Europe, that they discussed the statements, that Mr. Pope read the European submissions, and they made a conscious decision not to submit them. Now, there are certain things about that decision and why they made it that we have not been told because of privilege. But at trial, they each offered explanations. Mr. Pope's changed over time because first he said it was cumulative. Then he said we never made any argument about optional, and I'd like to get to that because they clearly did.  Mr. Pope then said the argument in Europe was only about permeable membranes, and these shifting stories were clearly part of why the district court found that there was an intentional failure to disclose. I'm confused about how could they claim privilege when the whole subject matter of the decision to withhold the EPO references was the issue in the case? There was still a claim of privilege? At the deposition, there were instructions. No, no, but at trial. Well, what happened was there was a series of events. At the deposition, there were some instructions not to answer from Abbott's counsel. When defendants said you can't do that because you're going to bring him to testify, we have to be able to inquire into everything, there was a promise made not to bring him to testify. No, I understand that. But when he testified at the trial, were there claims of privilege? Then when he testified at the trial, there were no questions on which he was instructed not to answer on grounds of privilege. So the story changed between deposition and trial, and at trial he offered many more explanations than he'd offered at deposition. It's important to remember, though, that one of the things that he said, and he kept saying, was optional doesn't really mean optional, and no one would read it that way, and that's why he submitted Dr. Sanghera's declaration. And I think the reason it's important to understand that is, first of all, if you look at the sentence, there's no way that optional means required. There's no way to contort that language to say so, and yet that's what Mr. Pope told the Patent Office. That's what the Sanghera declaration was designed to support, and that simply can't be right. Now at trial, Mr. Pope said, oh, these optionally but preferably kinds of words, they're just words that patent lawyers put in, and they shouldn't be given meaning. We put them in to make sure our claims aren't limited later on. So what he wants, of course, is a rule that patent lawyers can put those kinds of words in to broaden their disclosure and broaden their claims, but then they should be disregarded in any other circumstance. But these words have real consequences, and in Europe they actually said in the statement that you were asking counsel about, Judge Dyke, they told the European Patent Office, this language is unequivocally clear, the protective membrane is optional. In the U.S. they said it was required. That is flatly inconsistent, and there is no excuse, and there was deceptive intent. And by the way, Your Honor... In fairness, in the U.S. they couldn't avoid the language. The language is there. It says optionally but preferably for whole blood. They were saying that in the U.S. at the time, one of skill in the art would have understood that to mean required. That's right. Well, maybe that's a stretch, but that's the argument that they were making. That is the argument they were making, and telling the examiner that he should read it as meaning required was flatly inconsistent with having told the European Patent Office that it meant what it said. The membrane was optional. Their argument basically was the examiner should hold that weight despite this language. That's right. The language should not be given what it seems, the meaning it seems to have, but should be given a different meaning, and that's inconsistent, you say, with what they told the European Patent Office about the same language. That's correct, and I would just... I want to sit down to give Mr. Beckey his fair share of the time here, but in fact, in the European Patent Office's decision following the second submission, and this is in the record starting at J.A. 6563, on pages 65, 70, and 71, although it's clear that the focus of the Patent Office's decision in Europe was the difference in the type of membrane, it certainly did pick up on the point that was made that this was an optional membrane in the 636382. Thank you. All right. Since we gave the other side a little more time,  and you'll have your full time. Thank you, Your Honors. Bradford Batty for Becton Dickinson and Nova Biomedical. I just wanted to follow up because we are on the 551. I just wanted to point out that Dr. Sangheira, as Judge Alsop found, was impeached on multiple occasions in terms of the credibility question. The other thing I wanted to point out is because intent is so important here, that there was a very strong motivation to deceive the Patent Office, which is all reflected in the record. The 382 was expiring. They were desperate to find a patent to replace the 382. So there were a lot of high-level meetings that Dr. Sangheira in particular engaged in at Abbott in order to come up with a claim to replace the 382. Well, all applicants for patent are motivated to try to get patents allowed, are they not? Yes, they are, Your Honor. What makes this any different from that? Because the declarant himself was involved in competitive analysis, had actually tested competitive products, and indeed put in a declaration in a lawsuit that was filed on the same day. And Mr. Pope was listed of counsel. So these two individuals who were involved in a patent prosecution were also involved in litigation aspects and trying to come up with a claim to capture competitive products. But the point I'm trying to make is is motivation to get a patent allowed enough to show some inappropriate intent? No, no, not at all. All I'm suggesting, Your Honor, is that in this particular case, because the individuals were involved in that process, that they had more of a motivation than perhaps your typical patent prosecutor. This was important to them. It was very important to them, yes, Your Honor. That's the only point I'm trying to make on that. I'd like to move on to the non-flowing matter. And again, as Ms. Grevin said, this pertains to our clients and not to BEHR. Is there an interim position here on the claim construction? If we were to decide that convective flow is present in all liquids and that the non-flowing matter has to mean something different from that, and if at the same time we reject the flow through construction, is there some middle ground for us to adopt? Not that I can think of offhand, but it might make sense for me to address that convective flow issue. I don't think there was no evidence in the record, Your Honor, that convective flow is present in all liquids that have come to rest. There's Brownian motion and there's diffusion. This is what the record showed, that convective flow is flow, that it's a mass transfer. Their own experts said that. Their own experts said that there is flow in our device. And the reason we have flow, as opposed to other test strips, is because we have this unique well structure which causes the turbulence. It's kind of like a waterfall's effect. The sample flows in and then swirls around. And there's only a five second test time. Now if you take our sample and let it sit there for 15 or 20 seconds, it comes to rest and there's no convective flow. Roche, a co-defendant in the case, moved for summary judgment on the same basis. It was denied because they don't have this well structure. Baird did not move for summary judgment on this issue. So to say that the claimed construction basically wouldn't capture any test strip is just not correct. And so it's only because of the unique structure of our strip. There is no dispute that there is convective flow. Their own experts said that. Basically what they're trying to do is read the words in a non-flowing manner out of the claim. What they're trying to say now is that any sample within the sample chamber would satisfy the limitation. So if you look at the limitation, it says holding the sample in a non-flowing manner within a sample chamber. Basically they're reading out the words in a non-flowing manner because what they're saying is, what it really says is holding the sample within a sample chamber. So they're reading out the words in a non-flowing manner. That's what they're trying to do. I want to address a couple of issues, if I may, from the prosecution history. This examiner summary record, which talked about the flow-through cells, was in the parent case. It was not in this application. The parent case had different claims. Those claims were limited to coulometry. What happened in this case is the claims were rejected over a number of references, including NIWA, which was in the parent case, but also Nakajima. Now, NIWA was a flow-through cell. Nakajima was a non-flow-through cell. But in an amendment, Abbott themselves characterized Nakajima as having a relatively stationary sample. The examiner rejected the claims. They argued. Rejected again. They put in the amendment. They added the language in a non-flowing manner. The claims were then allowed. Wasn't Nakajima distinguished based on the sample size, not the flow, non-flow? Well, yes, that was one basis. It was essentially argued based on the sample size. Yes. And the NIWA reference was a flow-through sensor. Correct. So, doesn't that suggest that their argument is sound? That in a non-flowing manner should mean in a non-flow-through manner? That's what the distinction was over the cited prior art, as opposed to no flow within the sample? Well, we don't know whether that's what they were thinking or not. I think it's equally plausible to conclude that they looked at Nakajima. They wanted claims that would survive attack in litigation. And they decided they'd rather go with the non-flowing manner limitation, which would distinguish both of them. The examiner laid it out. In the parent case, they could have adopted that. They did not. And I think, again, if you just look at the claim language, which is what I think the district court judge did, the non-flowing manner language has that meaning, and they're trying to read it out. I mean, the district court looked at the patent itself, and the patent itself talks about flow cells, stopping flow cells. It talks about slow flow, and then it talks about samples at rest. It does seem to be unnecessarily narrow to say in a non-flowing manner means not even convective flow. Well, convective flow is any sort of turbulence at all, so it would exclude that. And all of these strips really have... But every liquid has some kind of convective flow in it, doesn't it? I don't know about that, Your Honor. I think that all liquids have browning motion and diffusion, but they don't all have convection. They employed a pretty prominent expert, Dr. Bard. He talks about mass transfer. If there's a mass transfer, if you can actually see it, and you can see this convection, mass transfer, that's what flow is. You can actually see it. Diffusion browning motion is not flow, and that's what's in all of these strips, and including our strip after 15 or 20 seconds, and that's why Roche and Baer don't have this issue in their case, because they do have a sample at rest. There's no convection. Was there a difference in summary in your judgment as to whether there was a swirling motion in your samples? Well, there is a swirling motion. I don't understand what you think there was. I'm asking, was there a genuine issue of material factors? No, there wasn't. We actually had videos. Their expert looked at our videos. You can actually see the swirling. There was no diffusion. Did he characterize it as swirling? He did. And he characterized it as flow. So basically what they're saying is, even though their expert says we have flow, that we satisfy a non-flowing manner limitation. So just linguistically, it doesn't make sense. Thank you. Thank you very much. Mr. Stengler? Thank you, Your Honor. Very quickly on the 164 of non-flowing manner. I don't want to get caught up in this, but the record is clear that convective flow is present in all liquids. It's at Joint Appendix 10553. Was there a dispute about whether there was swirling motion in the sample? No, Your Honor. There was no dispute about whether there was swirling. But the dispute was what is that swirling? And our expert said that swirling is convective flow. Convective flow is present in all liquids. And that is the basis for the summary judgment ruling. That because our expert said that's convective flow, he had admitted flow. So he admitted simply that it had motion that you find under an electron microscope or some kind of high-powered microscope in any fluid. Turning to the issue of inequitable conduct, there's two points I'd like to make. First is the issue before the PTO, and I think Judge Friedman referred to this earlier, was whether the membrane was optional for blood. Narrowly, clearly focused, all of the submissions to the PTO, is it required or optional for blood? And in the EPO, the issue was at best, was it optional at all? Because if it was optional in any fluid, interstitial fluid for example, which is called out in the EPO with the claims before the EPO, then that would have distinguished the prior art in the EPO. So the very fact that it's optional ever, and there's no dispute that it's optional for buffer, plasma, interstitial fluid, almost anything but blood, that would have sufficed for what was happening in the EPO. So the fact that  in and of itself cannot be directly inconsistent with what was told to the PTO. Wait a second. I mean the statement of the EPO refers to live blood. It isn't referring to other substances. It's referring directly to blood. That is just either a quotation or characterization of the sentence from the patent itself. And it's hard to see how that's not either cumulative or irrelevant. The fact that there's just a quotation of the language itself. But how do you read this sentence as suggesting that it's not optional for blood? It seems to me on the face of it, it's saying the protective member is optional. However, it's preferred when used with live blood. They're not ignoring blood. They're talking about blood as well as other substances. I understand, Your Honor. But that sentence right there is simply just a re-characterization of the sentence that was already before the examiner. That's the problem. Well, let me turn then to an issue that you raised, Your Honor, which is this Court's precedent in this area. And the live technology cases are directly on point. In the InnoGenetics case, and Abbott was on the other side of that case, the argument, the allegation of inequitable conduct was that the EPO had been told this prior art reference, the Cha reference, was the closest prior art on point. And the PTO was told that the Cha reference was unrelated to the invention. Those are the words. Unrelated. And that was the argument for inequitable conduct. And this Court held that that could not be a basis for inequitable conduct. The fact that the EPO was told that the prior art was the closest prior art on point, and the PTO was told it was unrelated to the invention, because it's simply characterizations of the prior art. In the live technologies case, it was something very similar. Inventors directly argued to the PTO examiner that a prior art reference did not disclose an invention or teach the invention. And then admitted in litigation that they themselves had learned the invention from the piece of prior art. And again, this Court held that cannot be, reversing the district court, that that cannot be inequitable conduct because all the inventors had done was to tell the examiner how to read the prior art. And the fact that they themselves had other views that they themselves had actually come to opposite conclusions themselves, did not have to be disclosed. And the fact that that wasn't disclosed to the examiner was not inequitable conduct because it's just a characterization of prior art. Prior art that's already in front of the examiner. This is not... You're saying that an attorney can take a position before the patent office and then take a contrary position before the patent office in a different case and not disclose that? Your Honor, with respect to characterizations of prior art, this Court's precedents draw a clear line that characterizations of prior art cannot be the basis of inequitable conduct. The Court has held that repeatedly. And we have not found, they have not cited, the district court has not cited any case in which this Court has affirmed a finding of inequitable conduct based on a supposed mischaracterization or failure to disclose a reading or characterization of the prior art. There's no case. And in every case, the Rothman case this year, just recently... So your theory is you can say one thing to the EPO and another thing to the U.S. Patent Office, no matter how inconsistent they are, you don't have to worry about it. No, Your Honor. My point is that characterizations, arguments about what prior art disclosed, those are not material information for the PTO. You can't make inconsistent statements about material facts, what we did, what we invented. What a reference discloses? What the reference discloses is characterizations of prior art. As I said, I don't know how to distinguish the Enogenetics case, in which the EPO was told the reference was the closest on point, and the PTO was told that it was not related. In fact, in that case... It seems to me there's a considerable difference between arguing over what is the closest reference on point and arguing whether the reference does or does not cover a particular thing. Well, then, Your Honor, the Life Technologies case, in which the district court's inequitable conduct funding was reversed, would be on that point. In that case, the inventors directly told the examiner a piece of prior art, the Johnson reference, did not disclose the invention. But in depositions at trial and during litigation, admitted that they themselves actually thought the contrary, that they themselves thought it did disclose that. And this court reversed inequitable conduct in part because those are not representations of material fact. That's what this court argued. What are representations as to ultimate issues? This is a representation about how you read a specific statement. I mean, it strikes me that what you're arguing is that if there's an issue as to what a statement means in the prior art, you can say it means X before the European Patent Office, and it means the exact opposite before the U.S. Patent Office. That seems to me to be a fairly aggressive notion that you don't have to disclose a directly inconsistent statement. Your Honor, there's two things. One is, I think that is what the court's cases hold. I do think that's just the case. And there is no case that anybody cited in which this court has held that characterization of prior art could be inequitable conduct. But secondly, one thing I'd ask the court to consider is if there is an inconsistency here, it is certainly not something that is as clear as unrelated to the invention and closest on point. There certainly is room in those documents for Mr. Pope or someone else to have read it differently than the district court. Thank you, Your Honor. All right. Case is submitted. We will now hear a